# **APPENDIX A**

**CONSENT TO ELECTRONIC COMMUNICATIONS**

Electronic communications in connection with your loan transaction and the Loan Agreement are governed by this consent (this "Electronic Consent").

In order to receive electronic communications in connection with this transaction, you will need a working connection to the Internet. You must have an internet browser that supports the SSL protocol which provides a secure channel to send and receive data over the Internet. You will also need either a printer to print disclosures/notices or sufficient hard drive space available to save the information. You must have your own internet service provider.

You agree that any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, the Loan Agreement, this Consent, disclosures, change-in-term notices, fee and transaction information, statements, delayed disbursement letters, notices of adverse action, and transaction information (collectively, "Communications"), may also be sent to you electronically by either sending it or a link to it to you by e-mail as permitted by applicable law.

You understand that we will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so. You may obtain a copy of any Communication by contacting us at www.rivervalleyloans.com, writing to us at customerservice@rivervalleyloans.com, or by calling us at (833) 987-4837. You will not be charged a fee for such copy. You also can withdraw your consent to ongoing electronic communications in the same manner and ask that they be sent to you in paper or non-electronic form. If you choose to receive Communications in paper or non-electronic form, we may elect to terminate your Loan Agreement and demand payment of the amount then due by the date of your withdrawal of consent; or by the expiration of any minimum term mandated by applicable law, whichever is later.

You will provide us with your current e-mail address for notices at the address or phone number indicated above. If your e-mail address changes, you must send us a notice of the new address by writing to us or sending us an e-mail, using secure messaging, at least 5 days before the change.

**PLEASE TAKE A MOMENT TO REVIEW THIS LOAN AGREEMENT CAREFULLY. YOU WILL BE REQUIRED TO ELECTRONICALLY SIGN AND DATE IT. YOU WILL ALSO ELECTRONICALLY SIGN AND DATE THE DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATIONS. BY ELECTRONICALLY SIGNING AND DATING THIS LOAN AGREEMENT, YOU AGREE TO BE BOUND BY ITS TERMS AS PROVIDED HEREIN.**

### LOAN AGREEMENT

Loan #▮▮▮▮96:

| Agreement Date: 5/19/2023 | Loan #: ▮▮▮▮96 |
| Effective Date: 5/19/2023 | Loan Type: Installment Loan |
| Wahido Lending d/b/a | Name: Nathan Horatschki |
| River Valley Loans | Address: ▮▮▮▮▮▮ |
| PO Box 222 | City: ▮▮▮▮▮ |
| Ft. Thompson, SD  57339 | State: IN, Zip: ▮▮▮▮▮ |
| Phone (833) 987-4837 | Phone: ▮▮▮▮▮▮▮ |
|  | Email Address: ▮▮▮▮▮ |

In this Agreement("Agreement") the words "we," "us" and "our" mean Wahido Lending d/b/a River Valley Loans, a wholly owned subsidiary of Dakota Economic Development Corporation ("DEDC"), a wholly owned economic arm of the Crow Creek Sioux Tribe, a federally recognized sovereign American Indian tribe in South Dakota ("Tribe"). "You" and "your" means the consumer who signs the Agreement electronically. The term "business day" means any calendar day other than a Saturday, Sunday or a bank or federal holiday, between the hours of 8AM and 5PM South Dakota time.

This Agreement is governed by the laws of the Tribe.

In order to complete your transaction with us, you must electronically sign and date this Agreement. We cannot commit to make a loan to you unless your completed application is approved by our underwriting department, located within the exterior boundaries of the Crow Creek Sioux Tribe. Once you sign and submit this Agreement, we will either approve or deny your request for credit from our office located on tribal land. If your

information cannot be verified by the Effective Date, your request for credit will not be approved, we will not fund the loan, and you will not incur any finance charge or fees.

## TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 519.08 % | $2,795.17 | $800.00 | $3,595.17 |

**Your Payment Schedule will be:**

Number of payments: 40      Amount of payments: $89.81      When payments are due: Weekly (each Friday)

**Late Charge:** If a payment is not paid within 5 days, you will pay a late fee of $20.

**Prepayment:** If you pay off early, you will not have to pay a penalty.

See the terms of the Agreement below for any additional information about nonpayment, default, any required repayment in full before the schedule date, and prepayment refunds and penalties.

ITEMIZATION OF AMOUNT FINANCED: Amount Financed/Amount provided to you: $800.00

### SPECIAL NOTICES:

- •YOUR LOAN IS AN EXPENSIVE FORM OF BORROWING.
- •YOU CAN SAVE FINANCE CHARGES BY PAYING OFF YOUR LOAN EARLY EITHER IN PART OR IN FULL.
- •YOUR LOAN IS DESIGNED TO ASSIST YOU IN MEETING YOUR SHORT-TERM CASH NEEDS. IT IS NOT A SOLUTION FOR LONGER TERM FINANCIAL PROBLEMS.
- •NON-PROFIT CREDIT COUNSELING SERVICES MAY BE AVAILABLE IN YOUR COMMUNITY FOR CONSUMERS EXPERIENCING FINANCIAL PROBLEMS.

**DISBURSEMENT:** If your loan is approved, we will process disbursement of your loan proceeds within a business day of the day your loan is approved. You authorize us to use commercially reasonable efforts to initiate a credit entry by depositing the proceeds of your loan into your Bank Account as described in your Disbursement and Payment Choice Authorization. The date that your loan proceeds are deposited to your Bank Account is the "Disbursement Date." You may not be able to access to the loan proceeds from your Bank Account due to unavoidable delays such as bank holidays, your bank's processing schedule, inadvertent processing errors, "acts of God," or "acts of terror." If you revoke this authorization before we credit the loan proceeds to you, then we will not be able to deposit the loan proceeds into your Bank Account. To find out whether or not a deposit has been made, you may contact customer service at (833) 987-4837.

**LATE CHARGE:** You agree to pay a late charge of $20 if a payment is 5 days or more late. If you authorize debits from your Bank Account in your Disbursement and Payment Choice Authorization, you also authorize us to debit your Bank Account for any late charges

**REFUSED INSTRUMENT CHARGE:** If any payment is refused, denied or otherwise dishonored by your bank for any reason, then you agree to pay us a refused instrument charge of $30. If you authorize debits from your Bank Account in your Disbursement and Payment Choice Authorization, you also authorize us to debit your Bank Account for any Refused Instrument Charge. Your refused instrument may also cause your payment to be late which could result in your having to also pay a late charge.

**YOUR PROMISE TO PAY:** You promise to pay us the Amount Financed and finance charges on the payment due dates according to the payment schedule in the Truth in Lending Disclosures above plus all other amounts owed to us under this Agreement. You agree that your finance charges will be calculated at the Annual Percentage Rate in the Truth in Lending Disclosures. All payments will be applied first to finance charges and fees and then to principal. If you would like to arrange a modified payment schedule, you must contact a customer service representative no later than 3 days prior to your next scheduled payment due date to make those payment schedule modifications if you would like them in effect for the next payment due date. You will make your payments on or before every payment due date until you have paid the entire principal, accrued finance charges and any other charges due under this Agreement. If on the final scheduled payment due date, you still owe amounts under this

Agreement, you will pay those amounts in full on that date. In your Disbursement and Payment Choice Authorization you will choose to either authorize electronic payments or agree to mail a cashier's check or money order to us.

**WHEN YOU BEGIN PAYING FINANCE CHARGES:** You begin to accrue finance charges for the loan as of the Disbursement Date. In calculating your payments, we have assumed you will make each payment on the day and in the amount due as described in your payment schedule. If any payment is made before the payment due date, the finance charges will be calculated as of the date of your prepayment, and any over payment will be applied to the amounts owed under this Agreement. Time is of the essence, which means that there are no grace periods for when payments must be made.

**PREPAYMENT:** You may prepay all or part of the amount you owe us at any time without penalty. If you prepay in full, you must pay the finance charges accrued on your loan and all other amounts due up to the date of the prepayment. If you wish to prepay your loan, then you must contact a customer service representative at (833) 987-4837 to obtain an accurate payoff amount and either provide us with authorization to effect a debit entry to your Bank Account for the prepayment, or otherwise advise us of your intended method of prepayment. If you prepay all or part of the principal amount due on your loan, your finance charges on the amount prepaid will be calculated as of the date of your prepayment.

**ASSIGNMENT:** This Agreement may not be assigned by you. We may assign or transfer this Agreement and our related rights and obligations without notice to you and your consent is not required if we make such an assignment or transfer.

**VERIFICATION:** You authorize us to verify the information you provided to us in connection with your loan application. You give us consent to obtain information about you from consumer reporting agencies or other sources at any time. We reserve the right to withhold funding of the loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**CREDIT REPORTING:** We may report information about your loan to consumer reporting agencies. Late payments, missed payments, or other defaults on your loan may be reflected on your credit report.

**CANCELLATION:** You may cancel your payment obligations under this Agreement, without cost or finance charges, no later than 5:00 p.m. South Dakota Time of the second business day immediately following the Disbursement Date ("Cancellation Deadline"). Your right to cancel your loan only applies if your loan either hasn't funded or, if it has, the funds are returned to us as explained below. To cancel your payment obligations on this loan, you must inform us in writing, by or before the Cancellation Deadline, by email to customerservice@rivervalleyloans.com that you want to cancel the future payment obligations on this loan. If we timely receive your written notice of cancellation on or before the Cancellation Deadline but before the loan proceeds have been deposited into your Bank Account, then we will not debit your Bank Account and both your and our obligations under this Agreement will be rescinded. However, if we timely receive your written notice of cancellation on or before the Cancellation Deadline but after the loan proceeds have been deposited into your Bank Account, then you authorize us to effect a debit to your Bank Account you chose in your Payment Choice Authorization for the principal amount of this Agreement. If we receive payment of the principal amount via the debit, then both your and our obligations under this Agreement will be rescinded. If we do not receive payment of the principal amount by debit to your Bank Account, then this Agreement will remain in full force and effect.

**CONSENT TO TEXT MESSAGES AND TELEPHONE CALLS:** You consent to receiving text messages relating to your loan, such as payment information, account information, due dates, delinquencies, and collection efforts, at any phone number you provided to us, from us or anyone acting on our behalf regarding your loan. You also consent to calls and text messages using an automatic telephone dialing system or an artificial or prerecorded voice. There is no fee for text messages but you are responsible for all charges imposed by your communications service provider.

**DEFAULT:** You will be in default under this Agreement if you do not pay us a scheduled payment or any other amounts you owe us when due or your payment is refused, stopped, denied or otherwise dishonored. If you default on your loan, we can choose to declare all principal, finance charges and other amounts that you owe us to be immediately due and payable in full.

**CONSEQUENCES OF DEFAULT:** Upon a default by you under this Agreement, we may, at our option, take any one or more of the following actions:

   (a)    Automatically and without further action or notice Accelerate Your Loan and require you to immediately pay us all amounts due and owing pursuant to such acceleration;

   (b)    Agree to permit you to cure a payment default before the loan goes into collection by modifying your Payment Schedule and/or payment amounts (a "Cure Arrangement"). This option is not available for all customers and/or all loan products. If we agree to a Cure Arrangement and you fail to honor its terms, then we will have the right, in our discretion, to terminate the Cure Arrangement and immediately and without notice declare the entire unpaid principal balance and all accrued unpaid finance charges and fees immediately due under your loan ("Accelerate Your Loan");

   (c)    If you authorized debits from your Bank Account, you agree that we can debit your Bank Account for the full amount that you owe us after providing you with any required notice;

(d)    Submit your loan to a collection agency and we may also report the default to a consumer reporting agency database. This may negatively impact your ability to write checks or to receive loans or advances from other companies; or

(e) Pursue all legally available means to collect what you owe us.

By electing any one of these options, we do not waive or release our right to subsequently elect and apply any other options to collect the amounts due and owing to us.

**GOVERNING LAW:** The laws of the Tribe will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

**SOVEREIGN IMMUNITY AND PRESERVATION OF SOVEREIGN IMMUNITY:** This Agreement and all related documents are being submitted by you to us as an economic development arm and instrumentality of the Tribe. The Tribe is a federally recognized Indian Tribe and enjoys sovereign immunity. Nothing in this Agreement constitutes a waiver of the Tribe's sovereign immunity and the Tribe's immunity is fully preserved and is not waived either in whole or in part by this Agreement and the Tribe expressly maintains all rights, titles, privileges, and immunities, to which the Tribe is entitled. To protect and preserve the rights of the parties, no person may assume a waiver of sovereign immunity. No waiver of the Tribe's immunity is or can be made except by express written declaration of the Tribe's Tribal Council specifically authorizing a waiver for the matter in question. No such waiver has been made with respect to either your Agreement (except to the extent described in the Arbitration Provision below) or your Disbursement and Payment Choice Authorization. As set forth below, the Tribe expressly preserves its sovereign immunity and you may not assert any claims against the Tribe. As an economic development arm and instrumentality of the Tribe, we are entitled to sovereign immunity to the same extent as the Tribe. We do not have the authority to waive sovereign immunity of any third parties, including, but not limited to, DEDC or the Tribe. To encourage resolution of consumer complaints, a complaint may be submitted by you or on your behalf as provided in the Dispute Resolution Procedure and Arbitration Provision below and the complaint is limited by the Dispute Resolution Procedure and Arbitration Provision.

<u>DISPUTE RESOLUTION PROCEDURE AND ARBITRATION PROVISION</u>

**DISPUTE RESOLUTION PROCEDURE:** As an accommodation to consumers, we have established the following Dispute Resolution Procedure to receive, review, and consider any and all types of complaints made by or on behalf of our consumers. A consumer who, in the course of his or her otherwise lawful and proper use of our business, has concerns about the operation of any part of us or who otherwise believes himself or herself to be aggrieved by some aspect of any part of our operation shall direct his or her concerns in the first instance to our management, in writing at customerservice@rivervalleyloans.com or contact us by mail at P.O. Box 222, Ft. Thompson, SD 57339. A consumer's complaint to us shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights. We will investigate the consumer's complaint and provide our initial determination as soon as is reasonably practicable. If the dispute is not resolved to your satisfaction, you and we agree that we shall arbitrate that dispute in accordance with the terms of the below Arbitration Provision.

**ARBITRATION PROVISION:** PLEASE READ THE FOLLOWING CAREFULLY AS IT IMPACTS YOUR LEGAL RIGHTS.

**WE, AS A WHOLLY OWNED ECONOMIC DEVELOPMENT ARM AND INSTRUMENTALITY, AND LIMITED LIABILITY COMPANY OF THE TRIBE, AND OUR DIRECTORS, OFFICERS, AND EMPLOYEES ACTING WITHIN THE SCOPE OF THEIR AUTHORITY, ARE NOT SUBJECT TO SUIT IN ANY COURT IN ANY JURISDICTION, OR ANY OTHER FORUM, ABSENT A WAIVER OF SOVEREIGN IMMUNITY.** In order to resolve a dispute that we cannot resolve to your satisfaction as set forth above, we consent to a limited waiver of sovereign immunity as expressly authorized by our Tribal Council in the Tribal Credit Code set forth below, which is expressly limited by the Arbitration Provision in this Agreement. This limited waiver is strictly limited to individual arbitration claims set forth below and judicial actions to enforce such individual arbitration awards as strictly limited herein.

**Definitions:** The words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Dispute Resolution Procedure and Arbitration Provision, the validity and scope of this Provision and any claim or attempt to set aside this Arbitration Provision? (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement, the information you gave us before entering into this Loan Agreement, including the customer information application, and/or any past Agreement or Agreements between you and us? (c) all counterclaims, cross-claims and third-party claims? (d) all common law claims, based upon contract, tort, fraud, or other intentional acts? (e) all claims based upon a violation of any tribal, federal or state constitution, statute or regulation? (f) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us? (g) all claims asserted by you individually against the Tribe, us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, "related third parties"), including claims for money damages and/or equitable or injunctive relief? (h) all claims asserted on your behalf by another person? (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us and/or related third parties ("Representative Claims")? and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us or related third parties of any non-public personal information about you.

<u>Notice:</u> Any party to a dispute, including you, us and/or related third parties, may send the other party or parties written notice by certified mail-return receipt requested of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, the arbitration shall occur before the American Arbitration Association (http://www.adr.org). However, the parties may mutually agree to select a different arbitrator who is an attorney, retired judge, or arbitrator registered and in good standing with an arbitration association and arbitrate pursuant to such arbitrator's rules. The party receiving notice of arbitration shall respond in writing by certified mail-return receipt requested within 20 calendar days. All parties to such dispute will be governed by the rules and procedures of the American Arbitration Association applicable to consumer disputes, to the extent those rules and procedures do not contradict the express terms of the Agreement, this Arbitration Provision, including the limitations on the arbitrator below, or our Tribal Code. You may obtain a copy of the rules and procedures by contacting the American Arbitration Association (http://www.adr.org).

Regardless of who demands arbitration, we will advance your portion of the expenses associated with the arbitration, including the filing, administrative, hearing and arbitrator's fees ("Arbitration Fees"). Throughout the arbitration, each party shall bear his, her or its own attorneys' fees and expenses, such as witness and expert witness fees, except as expressly provided in this Arbitration Provision. The arbitrator shall apply applicable substantive law consistent with the Governing Law set forth above, and the Federal Arbitration Act, 9 U.S.C. §§1-16 ("FAA") and applicable statutes of limitation and shall honor claims of privilege recognized at law. The arbitration hearing will be conducted in the county of your residence, unless you agree to a different location. In conducting the arbitration proceeding, the arbitrator shall not apply any tribal, federal or state rules of civil procedure or evidence. If the arbitrator renders a decision or an award in your favor resolving the dispute, the arbitrator shall award you reasonable attorneys' fees. If the arbitrator renders a decision or an award in your favor resolving the dispute then you will not be responsible for reimbursing us for your portion of the Arbitration Fees and we will reimburse you for any Arbitration Fees you have previously paid. Regardless of whether the arbitrator renders a decision or an award in your favor resolving the dispute, you will not be responsible for reimbursing us for your portion of the Arbitration Fees and we are not entitled to an award of attorneys' fees. At the timely request of any party, the arbitrator shall provide a written explanation for the award. The arbitrator's award may be filed with any court having competent jurisdiction.

This Arbitration Provision is binding upon and benefits you, your respective heirs, successors and assigns. This Arbitration Provision is binding upon and benefits us, our successors and assigns, and related third parties. This Arbitration Provision survives the termination of the relationship between you and us, and continues in full force and effect, even if your obligations have been cancelled by prepayment or paid or discharged through bankruptcy. This Arbitration Provision survives any termination, amendment, expiration or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing.

YOU ACKNOWLEDGE AND AGREE THAT BY EXECUTING THE AGREEMENT (INCLUDING THE TERMS OF THIS ARBITRATION PROVISION), SUBMITTING IT TO US, AND ACCEPTING THE LOAN PROCEEDS WITHOUT CANCELLING YOUR LOAN:

<u>NO RIGHT TO COURT RESOLUTION:</u> YOU ARE WAIVING YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES.

<u>WAIVER OF JURY TRIAL:</u> YOU ARE WAIVING ANY RIGHT YOU MAY OTHERWISE HAVE TO A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR AGAINST A RELATED THIRD PARTY.

<u>CLASS-ACTION/REPRESENTATIVE WAIVER:</u> YOU ARE WAIVING ANY RIGHT YOU MAY HAVE TO PURSUE OR PARTICIPATE IN REPRESENTATIVE CLAIMS AND YOU THEREFORE WILL NOT BE ALLOWED TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES. THEREFORE, THE ARBITRATOR SHALL NOT CONDUCT CLASS ARBITRATION; THAT IS, THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION.


### DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION

| DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION for Wahido Lending d/b/a River Valley Loans | Loan#: ████96 |
|---|---|
| REVIEW VERY CAREFULLY BEFORE EXECUTING THE LOAN AGREEMENT | |

<u>Your Electronic Credit Disbursement Authorization</u>

By electronically signing this Disbursement and Payment Choice Authorization below, you voluntarily authorize us to initiate disbursement credits you have authorized if a loan is made to you. This Disbursement and Payment Choice Authorization is a part of and relates to the Agreement. The words "you" and "your" mean the borrower who has electronically signed this Disbursement and Payment Choice Authorization. The words "we," "us" and "our" mean Wahido Lending d/b/a River Valley Loans and our successors and assigns.

**Disbursements to your Bank Account. Unless otherwise agreed, disbursement credits of your loan proceeds will be made to the following bank account (your "Bank Account").**

| | |
|---|---|
| Bank Name: | ▓▓▓▓▓ |
| Transit ABA Number: | ▓▓▓▓▓ |
| Bank Account Number: | ▓▓▓▓▓ |
| Debit Card Number: | |

We will make these disbursement credits by Automated Clearing House (ACH) entries or other electronic transfer.

**Your Payment Choice Authorization:**

| ☑ Automatic Payment from Your Bank Account. | ☐ Payments You will Make Directly. |
|---|---|
| By electronically signing this Payment Choice Authorization below, you voluntarily authorize us to initiate debits you have authorized if a loan is made to you. You authorize us (and our successors and assigns) to process payment debit entries out of your Bank Account using any commercially reasonable payment methods we choose, such as (but not limited to) ACH entries, remotely created checks or transactions through your debit card accessing your Bank Account. | You agree to make each of your scheduled payments in your payment schedule by cashier's check or money order that we receive no later than 5:00 pm South Dakota Time on or before the payment due date to: |
| You specifically authorize us to use any of these methods to process debit entries on each payment due date from your Bank Account for each scheduled payment detailed in the Truth in Lending Disclosures in the Agreement. You also authorize us to process debit entries for the amount of any late fee and any refused instrument charge as provided in the Agreement. You authorize us to reprocess debit entries for the same amounts if any attempted payment transaction is dishonored. | Wahido Lending d/b/a/ River Valley Loans PO Box 222 Ft. Thompson, SD  57339 |
| If you are in default, you authorize us to process one or more debit entries to pay all principal, finance charges and other amounts due to us as provided in the Agreement. | |
| We will provide you with at least 10 days' notice prior to processing a preauthorized debit entry that varies from the scheduled amounts, unless the variance results from your request and your new authorization for us to change the amount of your payments going forward. | |
| **You are not required to authorize this payment choice authorization option in order to be approved for a loan from us.** | |

If you have chosen to authorize payment from your Bank Account, you may revoke your authorization to automatic payments at any time by contacting us directly at (833) 987-4837 or customerservice@rivervalleyloans.com. Your revocation must be received no less than 3 business days prior to your scheduled payment date. If your scheduled payment has already been submitted to your financial institution at the time of revocation, it may be necessary for us to wait until that payment posts before we can refund you that payment amount. However, when possible, at the time of revocation, we will void any pending payments. You understand that revoking your authorization does not relieve you of the responsibility of timely paying all amounts due in full that are owed by you under the Agreement.

**BY TYPING YOUR NAME  AND CLICKING THE "YOU AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION AND AGREEING TO ALL TERMS OF THIS AUTHORIZATION.**

**YOU ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION FOR YOUR RECORDS.**

[YOU AGREE]
NAME: Nathan Horatschki

CONSENT TO RECEIVE ADVERTISING OR TELEMARKETING TEXT MESSAGES AND TELEPHONE CALLS

By signing this section, you consent to our sending you advertising and telemarketing text messages to the mobile phone number you have provided below. You also consent to our making advertising or telemarketing calls to you at your mobile phone number using automatic telephone dialing system or an artificial or prerecorded voice calls or texts.

**You are not required to consent to advertising or telemarketing text messages or calls to obtain credit or other services from us.** At any time, you may withdraw your consent to receive advertising or telemarketing text messages or marketing calls to the mobile number that you provided by calling us at (833) 987-4837 or emailing us at customerservice@rivervalleyloans.com.

You understand that any advertising and telemarketing text messages we send you may be accessed by anyone with access to your text messages and that your mobile phone service provider may charge you fees for advertising and telemarketing text messages that we send you.

Your electronic signature below to this section will be deemed to be your signature acknowledging your consent to receive advertising and telemarketing text messages and telephone calls as described above to your mobile phone at ███████████

Your Electronic Signature Below
NAME: Nathan Horatschki

QUESTIONS OR CONCERNS: If you have questions or concerns and need assistance, please telephone us at (833) 987-4837.

SIGNATURE AND ACCEPTANCE OF ALL TERMS AND CONDITIONS

BY ENTERING YOUR NAME AND CLICKING THE "YOU AGREE" BUTTON BELOW, YOU ARE ELECTRONICALLY SIGNING THIS LOAN AGREEMENT AND AGREEING TO ALL THE TERMS OF THIS AGREEMENT.

YOU ACKNOWLEDGE YOUR ABILITY TO DOWNLOAD OR PRINT A FULLY COMPLETED COPY OF THIS AGREEMENT AND THE ATTACHED PRIVACY POLICY FOR YOUR RECORDS.

[YOU AGREE]
DATE: 5/19/2023
████████████
NAME: Nathan Horatschki

# PRIVACY POLICY

Rev. April 2022

| FACTS | WHAT DOES WAHIDO LENDING d/b/a RIVER VALLEY LOANS DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share Your personal information. Consumers have the right to limit some but not all sharing. This notice tells You how We collect, share, and protect Your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service You have with Us. This information can include:<br>* Social Security number and checking account information<br>* Payment history and income<br>* Employment information and wire transfer instructions |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' |

 personal information; the reason Wahido Lending d/b/a River Valley Loans chooses to share; and whether You can limit this sharing.

| Reasons We can share Your personal information | Does Wahido Lending share? | Can You limit this sharing? |
|---|---|---|
| For Our everyday business purposes – such as to process Your transactions, maintain Your account(s), respond to court orders and legal investigations, or report to credit bureaus | YES | NO |
| For Our marketing purposes – to offer Our products and services to You | YES | NO |
| For joint marketing with other financial companies | NO | WE DO NOT SHARE |
| For Our affiliates' everyday business purposes – information about Your transactions and experiences | YES | NO |
| For Our affiliates' everyday business purposes – information about Your creditworthiness | YES | YES |
| For Our affiliates to market to You | YES | YES |
| For nonaffiliates to market to You | YES | YES |

| To limit Our sharing | * Call (833) 987-4837 our menu will prompt you through your choices or<br>* Contact us via email at customerservice@rivervalleyloans.com<br>Please note:<br>If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice. When you are no longer our customer, we can share your information as described in this notice.<br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call (833) 987-4837 or go to www.rivervalleyloans.com |

| Who We are | |
|---|---|
| Who is providing this notice? | Wahido Lending d/b/a River Valley Loans, a wholly owned subsidiary of Dakota Economic Development Corporation ("DEDC"), a tribally chartered economic arm and instrumentality of a sovereign American Indian tribe in South Dakota, is providing this privacy policy. |

| What We do | |
|---|---|
| How does Wahido Lending protect my personal information? | To protect Your personal information from unauthorized access and use, We use security measures. These measures include computer safeguards and secured files and buildings. |
| How does Wahido Lending collect my personal information? | We collect Your personal information, for example, when You<br><br>* Apply for a loan<br>* Give Us Your income information<br>* Tell Us where to send the money<br>* Provide account information<br>* Provide employment information<br><br>We also collect Your personal information from others, such as credit bureaus, affiliates or other companies. |
| Why can't I limit all sharing? | You have the right to limit only<br>* sharing for affiliates' everyday business purposes – information about Your creditworthiness<br>* affiliates from using Your information to market to You<br>* sharing for nonaffiliates to market to You |

| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on Your account. |
| --- | --- |

| Definitions | |
| --- | --- |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Our affiliates include other business entities of the Crow Creek Sioux Tribe, a sovereign American Indian tribe, and its economic development arm Dakota Economic Development Corporation* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Non-affiliates we share with include service providers and data processors.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to You.<br><br>• *Wahido Lending does not jointly market.* |

# **APPENDIX B**

# Get up to $3,000

**Apply Now (https://members.rivervalleyloans.com/application)**

⌄

## GET SIMPLE, FAST LOANS WITH TRIBAL INSTALLMENT LOA

At River Valley Loans, we work to make the online installment loan process easy, simple, and convenient for people who need cash now. W online loans through our straightforward loan approval process, so you don't have to worry about a thing. Our streamlined **online ap** installment loan application process from just about anywhere. After you get pre-approved online, then our quick and painless verificatio to the approval of your loan. After final approval and signing your loan documents, your money will be deposited into your bank accour business day. Check out our **About Page (https://rivervalleyloans.com/about/)** to learn more about tribal installment loans and ou



Installment Loans Lender
You Can Trust

Case 1:25-cv-00523-JRS-MG    Document 1-1    Filed 03/19/25    Page 13 of 63 PageID #: 39



Convenient & Fast Online
Loan ApplicationProcess



Quick Decision for Online
Installment Loans

# HOW DO INSTALLMENT LOANS WORK?

River Valley provides installment loans for those little emergencies and unexpected events which can happen with no warning, without the added stress of taking out an alternative loan. To learn more, read our FAQ (/loan-faq/) and learn about online installment loans, our entire loan process, payment schedules, fees, and more.

# PAY EMERGENCY EXPENSES WITH SAME-DAY INSTALLMEN'

You never know when life might hit you with an unexpected expense. Whether your car breaks down, the electric bill is hig expected, or your dog suddenly gets sick, our simple, fast online approval process can help get you the money you need, when



Car Repair



Home Repair



Hospital Bills



Cell Phone Repair



Moving Costs



Extra Utility Bills



Owed Taxes



Vet Bills

# ARE ONLINE LOANS SAFE?

We are committed to upholding our responsibilities to the highest standard under industry-wide lending best practices & gu
complete transparency during the loan process, and diligently safeguarding your personal information and rights.



## Personalized Customer Care

Our team treats each individual customer with the utmost respect. Feel free to voice any questions or concerns at any time, whether yo
customer or not.



## Cancel Any Time

Once your loan is approved and signed, you are still free to cancel until 4 pm CST the next business day after the cash disbursement da



### Trusted, Convenient Online Lending Source

We adhere to industry-standard lending best practices, and diligently safeguard our customer's safety, privacy, and rights.



### Data Protection

Your personal information is safe with us. We use cutting edge security technology to protect your data from any unauthorized or malic



### Upfront Fee Disclosure

Know exactly what your total repayment amount and terms will be before signing your installment loan agreement.

# About River Valley Loans, Tribal Lenders

River Valley Loans is a tribal lending entity owned by an American Indian Tribe. We offer online installment loans to anyone, not just tribal members, in times of urgent need, even if they don't have good credit. We want to help everyone that we can when unexpected financial expenses happen.

## HOW DO OUR LOANS WORK?

River Valley Loans are designed as a short-term financial resource. These loans are for people who need a limited amount of cash to help cover an emergency or surprise expense, but aren't able to pay it off right away. Customers pay off their loans in a set number of installment payments with no endless renewals or rollovers.

## OUR LICENSE



THIS LICENSE MUST BE CONSPICUOUSLY POSTED IN THE PUBLIC OFFICE

**LICENSE #2021-005**

### CERTIFICATE OF LICENSURE
### FINANCIAL SERVICES COMPANY

*This is to Certify,* that pursuant to and in accordance with the Tribal Credit Code of the Crow Creek Sioux Tribe ("Tribe"), I, the undersigned, as Commissioner of the Crow Creek Financial Services Licensing & Regulatory Commission, do hereby issue this license for purposes of the Tribe's consumer lending business to the below-named company.

*Wakido Lending d/b/a River Valley Loans*
*P.O. Box 246*
*Ft. Thompson, SD 57339*

subject to revocation as provided by Tribal Law. This license is a revocable privilege to do business within the jurisdiction of the Crow Creek Sioux Tribe. The issuance of this License is based on the Application filed with the Commission on August 5, 2021. This License has an **Issuance/Effective Date of September 7, 2023,** and an **Expiration Date of September 7, 2025.**

This license cannot be transferred or assigned and continues in effect until terminated/suspended under Tribal Law or until the Expiration Date.

*In Witness Whereof,* I have hereto set my hand on the date appearing below.

Date: September 5, 2023.

SHANE THIN ELK, COMMISSIONER
Crow Creek Financial Services Licensing &
Regulatory Commission

# SEE WHAT YOU'RE APPROVED FOR TODAY

### Apply Now

# APPENDIX C

BA20221292987



## STATE OF CALIFORNIA
*Office of the Secretary of State*
## STATEMENT OF INFORMATION
## CORPORATION
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: BA20221292987 |
| Date Filed: 12/21/2022 |

B1339-7818  12/21/2022  2:13 PM Received by California Secretary of State

---

### Entity Details

| | |
| --- | --- |
| Corporation Name | CREDITSERVE, INC. |
| Entity No. | 3351034 |
| Formed In | CALIFORNIA |

### Street Address of Principal Office of Corporation

| | |
| --- | --- |
| Principal Address | 137 N. LARCHMONT BLVD., #705<br>LOS ANGELES, CA 90004 |

### Mailing Address of Corporation

| | |
| --- | --- |
| Mailing Address | 137 N. LARCHMONT BLVD., #705<br>LOS ANGELES, CA 90004 |
| Attention | |

### Street Address of California Office of Corporation

| | |
| --- | --- |
| Street Address of California Office | 137 N. LARCHMONT BLVD., #705<br>LOS ANGELES, CA 90004 |

### Officers

| Officer Name | Officer Address | Position(s) |
| --- | --- | --- |
| ERIC WELCH | 137 N. LARCHMONT BLVD., #705<br>LOS ANGELES, CA 90004 | Chief Executive Officer, Secretary, Chief Financial Officer |

### Additional Officers

| Officer Name | Officer Address | Position | Stated Position |
| --- | --- | --- | --- |
| None Entered | | | |

### Directors

| Director Name | Director Address |
| --- | --- |
| ERIC WELCH | 137 N. LARCHMONT BLVD., #705<br>LOS ANGELES, CA 90004 |

The number of vacancies on Board of Directors is: 0

### Agent for Service of Process

| | |
| --- | --- |
| California Registered Corporate Agent (1505) | COGENCY GLOBAL INC.<br>Registered Corporate 1505 Agent |

### Type of Business

| | |
| --- | --- |
| Type of Business | FINANCIAL |

### Email Notifications

| | |
| --- | --- |
| Opt-in Email Notifications | No, I do NOT want to receive entity notifications via email. I prefer notifications by USPS mail. |

### Labor Judgment

No Officer or Director of this Corporation has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

Electronic Signature

☒ By signing, I affirm that the information herein is true and correct and that I am authorized by California law to sign.

*Christopher Chatham*
Signature

*12/21/2022*
Date

# APPENDIX D

Home » Tribal Lending Conference



# Registration Is Now Open For 2025

Our 2025 OLA Tribal Lending Conference will be held May 13-15 in Tulsa. OK at the River Spirit Casino Resort.

Sign up here today!

Register For 2025

# Dates

May 13-15, 2025



HOME        ABOUT        RESOURCES        MEDIA        EVENTS        ADVOCACY
MEMBERSHIP              SIGN IN

3/18/25, 8:30 AM                    Tribal Lending Conference - Online Lenders Alliance

The 2025 OLA Tribal Lending Conference will be held May 13-15 at the River Spirit Casino Resort in Tulsa, OK.  The agenda will explore the current state of sovereign lending, tribal economic development, and the latest regulatory and legislative developments from federal and state governments. Participants will find incredible value in our sessions and won't want to miss this opportunity to hear from our expert speakers. We encourage those from our leading online lenders, service providers, vendors, and law firms to attend.

# Agenda

More information on our agenda will be available closer to the event date.  For travel planning purposes, please note that the conference will begin with an optional off-site visit around 1:00 PM on Tuesday, May 13th.  The program will officially kick off with a reception at 5:00 PM on Tuesday, May 13th, and the event will conclude around noon on Thursday, May 15th. The agenda framework can be viewed here.

2025 Agenda Framework

# Registration

All prices are at the discretion of OLA. Cancellations received by Friday, April 11th will receive a refund minus a $50 processing fee.  Cancellation requests made after Friday, April 11th will not be refunded.  Name substitutions are accepted free of charge at any point before the start of the program.



HOME        ABOUT        RESOURCES        MEDIA        EVENTS        ADVOCACY
MEMBERSHIP        SIGN IN

- Non-Member: $1,499
- Regular: (Expires May 9th)
  - Member: $899
  - Non-Member: $1,599
- Onsite: (Expires May 15th)
  - Member: $999
  - Non-Member: $1,699

Please note that all registrations are subject to approval by the Online Lenders Alliance (OLA).

Register Now

# Hotel

We have reserved a block of discounted rooms at our venue (River Spirit Casino Resort / 8330 Riverside Parkway / Tulsa, OK 74137) at a rate of $159++ per night.  To make your reservation, please use the link below.  Note that this block is available until Friday, April 11th or the block fills up, whichever comes first.  The last several years our hotel block sold out early so we encourage you to make your hotel reservations at the time of registration to secure your room.

Book Hotel

# Sponsorship



HOME          ABOUT          RESOURCES          MEDIA          EVENTS          ADVOCACY
MEMBERSHIP          SIGN IN

3/18/25, 8:30 AM                                       Tribal Lending Conference - Online Lenders Alliance

# Questions

Please contact Russell Crutcher at rcrutcher@oladc.org with any questions.

## Thank you to our sponsors

### PLATINUM



### GOLD







HOME        ABOUT        RESOURCES        MEDIA        EVENTS        ADVOCACY
MEMBERSHIP        SIGN IN






## BRONZE












HOME        ABOUT        RESOURCES        MEDIA        <u>EVENTS</u>        ADVOCACY
MEMBERSHIP            SIGN IN

Tribal Lending Conference - Online Lenders Alliance

  



## Contact Info

contact@oladc.org

703-567-0327

Mon - Thurs: 9:00am - 5:30pm EST

Friday: 9:00am - 4:30pm EST

## Links

**About OLA**

**OLA Seal & Hotline**

**OLA in the News**

**How to Join**

© 2025 Online Lenders Alliance.



# **APPENDIX E**

Filing # 161895997 E-Filed 11/28/2022 12:08:29 PM

IN THE COUNTY COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
SMALL CLAIMS DIVISION

KESHA JOHNSON,

     *Plaintiff,*

     v.

**CREDITSERVE, INC., VIKING CLIENT
SERVICES, LLC, LEAD ENVY, LLC,
CLARITY SERVICES, INC.,** *and*
**UNKNOWN COMPANIES 1-10,**

     *Defendants.*

Case Number:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Kesha Johnson** ("**Ms. Johnson**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **CreditServe, Inc.** ("**CreditServe**"), **Viking Client Services, LLC,** doing business as **Viking Billing Services** ("**Viking**"), **Lead Envy, LLC,** doing business as **Tekambi** ("**Tekambi**"), **Clarity Services, Inc.** ("**Clarity**"), and **Unknown Companies 1-10** (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.    This is an action for damages not exceeding $8,000, exclusive of fees and costs, brought by Ms. Johnson against the Defendants for violations of the Florida *Civil Remedies for Criminal Practices Act*, Florida Statutes § 772.101, *et seq.* ("**CRCPA**"), and against CreditServe and Viking for violations of the *Florida Consumer Collection Practices Act*, Florida Statutes § 559.55, *et seq.* ("**FCCPA**") and for unjust enrichment.

## JURISDICTION AND VENUE

2.    Jurisdiction arises under the FCCPA, Florida Statutes § 559.55, the CRCPA, Florida Statutes § 772.104, and Florida Statutes § 34.01.

3.      The Defendants are subject to the provisions of the FCCPA and/or the CRCPA and to the jurisdiction of this Court pursuant to Florida Statutes § 34.01.

4.      Venue is proper in Hillsborough County, Florida, pursuant to Florida Statutes §47.051, because the acts complained of were committed and / or caused by the Defendants within Hillsborough County.

## PARTIES

### Ms. Johnson

5.      **Ms. Johnson** is a natural person residing in the City of Tampa, Hillsborough County, Florida.

6.      Ms. Johnson is a *Consumer* as defined by the FCCPA, Florida Statutes § 559.55(8).

### CreditServe

7.      **CreditServe is** a California corporation with a primary business address reported as **137 N. Larchmont Blvd., Suite 705, Los Angeles, CA 90004**

8.      CreditServe is not registered to conduct business in the State of Florida. Its California registered agent is **Christopher Chatham, 3109 W. Temple St., Los Angeles, CA 90026.**

### Tekambi

9.      **Tekambi** is a Delaware limited liability company with a primary business address of **23150 Fashion Drive, Suite T242, Estero, FL 33928.**

10.      Tekambi is registered to conduct business in the State of Florida, where its registered agent is **Corporate Creations Network Inc., 801 US Highway 1, North Palm Beach, FL 33408.**

**Viking**

11.     Viking Billing Services, also referred to as Viking Payment Service, is a subdivision of Viking Client Services, LLC, and at all times relevant, processes *Automated Clearing House* ("**ACH**") payment transactions for River Valley Loans. Its primary business address is **10050 Crosstown Cir., Suite 300, Eden Prairie, MN 55344**

12.     Viking is registered to conduct business in the State of Florida, where its registered agent is **Business Filings Incorporated, 1200 S. Pine Island Rd., Plantation, FL 33324**.

**Clarity**

13.     **Clarity** is a Delaware corporation with a primary business address of **475 Anton Blvd., Costa Mesa, CA 92626.**

14.     Clarity is registered to conduct business in the State of Florida, where its registered agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

**Unknown Companies 1-10**

15.     Unknown Companies 1-10 are entities involved in the making of short-term, high-interest loans via a business known as River Valley Loans, which, ostensibly, is owned by Wahido Lending, a tribal lending entity operated by the Crow Creek Sioux Tribe of South Dakota.

16.      Unknown Companies 1-10 each provided services on loans issued by River Valley Loans, such as providing capital to fund the loans, requesting consumer credit reports on potential borrowers, marketing the lending website, and servicing the loans.

17.     Plaintiff believes she can ascertain the identity of Unknown Companies 1-10 since their true names are recorded in business records, such as domain name registration records, which Plaintiff should uncover in discovery.

18.     Upon uncovering the identities of such entities, Plaintiff will amend her complaint.

## FACTUAL ALLEGATIONS

### River Valley Loans Makes Unlawful Loan to Plaintiff

19.     On or around June 29, 2022, River Valley Loans made a $600 loan to Ms. Johnson (the "**First Loan**"). **SEE PLAINTIFF'S EXHIBIT A.**

20.     The First Loan had a stated annual percentage rate of 676.89%. *Id.*

21.     Thus, Ms. Johnson was to repay a total of $3,213.94 for a $600 loan in less than nine months. *Id.*

22.     On or about June 30, 2022, CreditServe, via Viking, then transferred the proceeds of the First Loan through the ACH network into Ms. Johnson's checking account which she maintained in Tampa.

23.     The ACH memo line for the transaction stated "VBS RiverValleyL 8339874837." **SEE PLAINTIFF'S EXHIBIT B.**

24.     Upon information and belief, "VBS" is shorthand for Viking Billing Services and indicates that Viking was the entity originating the ACH transaction.

25.     Beginning on or about July 15, 2022, CreditServe, via Viking, then began debiting Ms. Johnson's checking account via the ACH network and withdrawing bi-weekly interest payments.

26.     The ACH memo line for this transaction also stated "VBS RiverValleyL 8339874837," with the "VBS" again indicating the transaction was initiated by Viking. **SEE PLAINTIFF'S EXHIBIT C.**

27.     Ms. Johnson repaid at least $642.72 towards the First Loan.

28.     Around September 13, 2022, Ms. Johnson refinanced the First Loan, accepting a new loan in the amount of $591 (the "**Second Loan**") (jointly, the "**Loans**").

29.    On information and belief, the Second Loan also had an annual percentage rate that exceeded 600%.

30.    The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

31.    Florida Statutes § 687.02(1) renders any loan usurious which is made at interest rates **greater than 18%** per year

32.    Florida Statutes § 687.071(3) renders loans made with annual interest rates **greater than 45%** a third-degree felony.

33.    Florida Statutes § 687.071(7) renders any criminally usurious loan void and unenforceable.

34.    Long-standing public policy in Florida confirms the impossibility of the alleged debt. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

35.    Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

36.    Florida law further prohibits any recovery of the principal for such usurious loans. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

37.    The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*,190 So.2d 415 (Fla. 2d DCA 1966).

38.    The Loans made to Ms. Johnson by River Valley Loans included annual percentage rates that vastly exceeded the maximum lawful interest rate in Florida.

39.    The making, and collection, of the Loans constitutes a felony pursuant to Florida Statute § 687.071(3).

40.    Because the Loans were subject to annual interest rates which vastly exceeded the 45% limit as proscribed in Fla. Stat. § 687.071(3), the Loans were void *ab initio* and unenforceable pursuant to Fla. Stat. § 687.071(7).

41.    Thus, the balances on the Loans were *unlawful debts* per Fla. Stat. §772.102(2)(a)(3).

42.    <u>Any</u> amount repaid on an illegal, usurious debt deemed void *ab initio* by state law constitutes unjust enrichment, even if less than the original amount of the loan. *See, e.g., Williams et al. vs. Big Picture Loans, LLC*, case 3:17-cv-461, E.D. Virginia, July 20, 2021.

43.    The proceeds from the Loans were used by Ms. Johnson for personal, family, or household purposes, and thus the Loans meet the definition of *Debt* under the FCCPA, Florida Statute § 559.55(6).

44.    River Valley Loans made multiple collection communications to Ms. Johnson, via e-mail, text message and phone.

45.    River Valley Loans reported the Loans to Clarity, a nationwide *consumer credit reporting agency* ("**CRA**").

46.    By reporting the Loans to a nationwide CRA, CreditServe and Tekambi were ostensibly certifying that the Loans were legally valid debts, which they were not.

47.    The actions of CreditServe and Tekambi thus made clear to Ms. Johnson that her credit reports and scores would be adversely impacted if she did not repay the Loans; CreditServe and Tekambi in essence reported illegal, unenforceable debts to the CRAs in order to hold Ms. Johnson's credit report hostage in their attempts to ensure payment of usurious loans.

48.    Reporting a debt to a CRA is an attempt to collect the debt alleged therein. See, e.g., *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless [Fair Debt Collection Practices Act] cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

### Rent-A-Tribe Schemes

49.    River Valley Loans is purportedly owned by the Crow Creek Sioux Tribe, a federally recognized sovereign Native American tribe in South Dakota (the **"Crow Creek Tribe"**).

50.    In reality, the Crow Creek Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

51.    In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

52.    While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

53.    However, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; "reasonable people would know that collecting unlawful debt is unlawful").

54.     Supposedly, River Valley Loans operates under a lending license granted by the Crow Creek Financial Services Licensing & Regulatory Commission. **SEE PLAINTIFF'S EXHIBIT D.**

55.     The "commission" has but one commissioner – Shane Thin Elk (**"Thin Elk"**) – who is not a member of the Crow Creek Tribe.

56.     Thin Elk is an attorney who previously lived in Omaha, Nebraska, and formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "PROTECTING Tribal Sovereignty."

57.     Thin Elk claims to be an expert in "rent-a-tribe" matters and was a speaker at a Tribal Employment Rights & Law Conference in April 2014 in Prior Lake, Minnesota. The program for the seminar summarized his speech as, "Structuring the system: Essential elements for workable Tribal codes; selecting or creating effective grievance and dispute resolution bodies and processes; special considerations for partnering with non-Tribal entities for commercial enterprises." **SEE PLAINTIFF'S EXHIBIT E.**

58.     Tellingly, Thin Elk also supposedly holds the identical job as "commissioner" of the Financial Services Licensing & Regulatory Commission for a completely different, unrelated tribe – the Native Village of Minto (the **"Minto Tribe"**), in Minto, Alaska.

59.     The Minto Financial Services Licensing & Regulatory Commission – whose only commissioner is Thin Elk – issued a single license so far in its history: to Minto Money, an online lender which provides payday loans to consumers at interest rates close to 800% annually.

60.     The Minto Tribe is a small, isolated, financially-strapped Native American tribe with approximately 223 enrolled members, located about 75 miles northwest of Fairbanks, Alaska.

61.     Minto Money claims to operate from offices located at 205 Lakeview Dr., Suite 7, Minto, AK 99758; however, the building located at 205 Lakeview Drive does not contain any offices divided into suites, and is used for school and senior lunch programs, community meetings, and village council operations.

62.     Minto Money is operated by Douglas Isaacson and his related entities and investors; Isaacson is not a member of the Minto Tribe.

63.     Even a cursory examination of the "license" issued by Thin Elk to River Valley Loans in September 2021 reveals it is virtually a copy-and-paste job from the license issued June 3, 2019, by Thin Elk to Minto Money.

64.     Both licenses contain identical verbiage, formatting (*e.g.*, use of boldface and italics are identical and in identical places), and even the identical copy-and-pasted signature.

### River Valley Loans Is a Racketeering Conspiracy

65.     None, or virtually none, of River Valley Loans' business is conducted on the Crow Creek Tribe's reservation.

66.     Rather, all essential business operations are performed in other locations outside of the Crow Creek Tribe's jurisdiction, including in California, Texas, and Florida.

67.     The server for RiverValleyLoans.com operates from an IP address of http://35.227.10.189/, corresponding to a physical location in South Carolina, which is over 1,000 miles from the Crow Creek Tribe's reservation. **SEE PLAINTIFF'S EXHIBIT F.**

68.     Off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

69.     These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance and marketing.

70.     The Crow Creek Tribe has engaged in many other similar "rent-a-tribe" schemes with other non-tribal investors in the past.

71.     For example, until recently, the Crow Creek Tribe engaged in a scheme with Devwire Consulting, LLC and Scott Frasier Turnbull, beneficial owners of the lending platform MyLoanSite.com; the website made loans to consumers in Florida at interest rates typically exceeding 700% annually.

### Viking's Role in Conspiracy

72.     Viking provides ACH, debit card, and credit card payment processing services to the "tribal" online lending industry.

73.     Viking spends heavily to promote its services at trade conventions and similar; for example, it was a "Gold Level" sponsor of the Online Lenders Alliance ("**OLA**") 2022 Tribal Lending Conference, held November 1-3, 2022 at an upscale resort in Chandler, Arizona. **SEE PLAINTFF'S EXHIBIT G.**

74.     According to the OLA, "Gold Level" sponsorship requires at least $20,000 in additional membership dues to be paid.

75.     Viking was also a premium sponsor at a similar industry gathering, the "Tribal Lending Summit" in August 2022.

76.     Viking processes ACH, debit card, and credit card payments for a large number of entities in the online payday lending industry, including Big Picture Loans, Oxford Financial, Inbox Loans, Better Day Loans, MaxLend, Blue Trust Loans, and many others.

77.     All of the aforementioned lenders claim "tribal" ownership but are actually operated by non-tribal entities as part of rent-a-tribe schemes, and all typically make loans at interest rates exceeding 600% annually.

78.     Viking also operates a large, legitimate debt collection agency which collects debts on behalf of many large companies.

79.     Viking then leveraged certain banking relationships it has established over the years to profit by acting as a broker to provide access to the ACH network which online payday lenders like River Valley Loans critically need to function, as virtually no bank would be willing to process ACH transactions for online lenders charging 700% interest to consumers in states where such loans are illegal.

80.     The ACH network is administrated by the *National Automated Clearing House Association* ("**NACHA**"), which implements numerous requirements which participating payment processors must meet.

81.     One such requirement is that *Originating Depository Financial Institutions* ("**ODFIs**") must gather detailed information about the business operations of their customers to whom they grant access to the ACH network. The ODFIs "are the gatekeepers of the ACH Network." *2013 NACHA Operating Rules, Section 2.1 General Rule – ODFI is Responsible for Entries and Rules Compliance (2013 NACHA Operating Rules & Guidelines, Page OR4).*

82.     In 2013, the United States Department of Justice ("**DOJ**") initiated Operation Choke Point and investigated a large number of banks that processed ACH transactions for payday lenders, as well as other companies believed to be at a high risk for fraud and money laundering. As a result of this, many larger banks, including Capital One Bank and Fifth Third Bank, terminated ACH processing for payday lenders. In March 2015, the DOJ announced a civil and criminal settlement with CommerceWest Bank due, in large part, to the bank's processing of payday loan fees.

83.     Although Operation Choke Point wound down in August 2017, its effects are still felt today by the online payday lending industry, as no large banks – and only a handful of smaller banks – will knowingly process ACH transactions for legal, licensed payday lenders.

84.     Thus, an entire cottage industry exists of ACH payment brokers and middlemen servicing the "tribal" payday lending industry, of which Viking is one of the largest.

85.     These brokers and middlemen gain the ability to process ACH transactions through small banks and then re-sell access to the ACH network, at considerable mark-ups.

86.     These brokers and middlemen often obfuscate – or outright lie – to their ODFI about the end-user's actual business.

87.     Small, everyday, low-risk businesses typically pay 20 to 30 cents per ACH transaction; larger businesses with processing volumes pay only a few cents. In contrast, it is not unusual for ACH transaction brokers like Viking to charge 5% to 15% of the total dollar amount processed, meaning they can profit $50,000 to $150,000 per $1 million processed by their customers. These outsized, windfall profits provide strong motivation for transaction brokers to hide their customers' actual business.

88.     Viking, which processes a large amount of legitimate ACH, debit, and credit card transactions as part of its consumer debt collection business, created a "subdivision" of its company, Viking Billing Services.

89.     Upon information and belief, Viking's ODFI allows Viking – a "billing service" – to vet the customers and perform the requisite "due diligence" on Viking's clients itself.

90.     Upon information and belief, Viking does not disclose to its ODFI that the payments it processes for CreditServe are short-term loans made at 700% interest rates.

91.    Viking is able to charge a substantial mark-up to the cost it pays its ODFI to process transactions and what Viking charges its customers – fees which are deducted from the net amount wired to CreditServe.

92.    Ms. Johnson made a $160.68 payment – nearly all of which was interest – on July 15, 2022 to CreditServe, which was processed by Viking. By way of example, if Viking charged a 5% fee to CreditServe, it would have received $8.03 of Ms. Johnson's money for its services.

93.    Viking's relationship with CreditServe is hardly a secret. Indeed, Viking's website includes a testimonial from Eric Welch ("**Welch**"), the President and CEO of CreditServe, stating: "The Viking Team works tirelessly ensuring clients are well-serviced and informed, which makes Viking the most reliable payment processor in the industry. On top of their extended hours and Sunday night ACH processing, they can integrate with any software. The extended hours are not just for processing, but they provide customer service later than other processors. Pure and simple, Viking is easy to use, reliable, and they truly put their clients first." **SEE PLAINTIFF'S EXHIBIT H.**

94.    Viking also processes ACH transactions for Loan At Last, an online lender operating from LoanAtLast.com which makes loans at interest rates averaging 700% as well.

95.    LoanAtLast.com is beneficially owned by Welch and CreditServe and operates under a similar "rent-a-tribe" deal with the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "**LDF Tribe**").

96.    The LDF Tribe is one of the largest purveyors in the rental market for "sovereign immunity" and purports to operate almost four dozen different online lending websites.

97.    Despite supposedly owning a multitude of different payday loan websites, transacting tens of millions of dollars in total revenues per month, a feat which would require

hundreds, if not thousands, of employees in aggregate, each and every payday lending website purportedly owned by the LDF Tribe, until recently, stated that its business office was at one location: 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538.

98.    This address is a small building, the first floor of which is occupied by the LDF Smoke Shop.

99.    The president of LDF Holdings, Jessi Lee Phillips Lorenzo ("**Lorenzo**"), lives in an upscale apartment complex in the Hyde Park area of Tampa and previously worked for Triax Management & Dater Portfolio between August 2015 and December 2016 as "Director of Sovereign Sales." Lorenzo is not a member of the LDF Tribe or any Indian Tribe.

100.    Lorenzo has described her former employer's business model of selling sovereign immunity to non-tribal entities as follows: "In today's regulatory environment it is very important to do business with people that will do things the right way. Triax and Dater have been building very successful businesses over the past 5 years. Our success formula is simple: *Identify Great Tribes, Financiers, Servicers and Best in Class Legal Teams* and have them work cooperatively to build a very profitable compliant business based upon consumer satisfaction." (Emphasis added.)

### Tekambi's Role in Enterprise

101.    A key component to a successful online loansharking business is the identification of consumers who are willing to take out triple-digit interest rate loans and also have the financial means to repay such loans.

102.    To automate this process, lenders making short-term, high-interest online payday loans often utilize outside service contractors to help them cost-effectively purchase leads, analyze those leads, and then underwrite the loan if the lead elects to apply for a loan.

103.    Tekambi advertises itself on its website as "the smartest way to manage lead data" and trumpets that "Tekambi's unique lender solutions optimize the lender / borrower lifecycle." *See* https://tekambi.com/, accessed November 21, 2022.

104.    Tekambi's services include "loan origination and decisioning, underwriting and fraud prevention, customer management, and collections and debt management. *Id.*

105.    According to its March 1, 2022, press release, Tekambi is "a customer-focused online lead management system for alternative credit lenders. With reliability and flexibility at its core, Tekambi is a robust plug-and-play solution that changes the way lenders manage their marketing campaigns and lead filtering process." Press Release, GlobeNewswire, Aquila expands across lending vertical with acquisition of Tekambi (March 1, 2022) https://www.globenewswire.com/en/news-release/2022/03/01/2394530/0/en/Aquila-expands-across-lending-vertical-with-acquisition-of-Tekambi.html.

106.    As part of the lead-generation and underwriting process, Tekambi obtained consumer credit reports on Ms. Johnson from Clarity.

107.    Both Chex Systems and Clarity record the inquiry as being requested "On Behalf Of: RIVERVALLEY-SEAWARD-CRDSRV-TKMBI."

108.    Upon information and belief, "CRDSRV" is shorthand for CreditServe and "TKMBI" is shorthand for Tekambi.

109.    Thus, Tekambi was involved in obtaining credit bureau reports on Ms. Johnson, and it also played a role in determining that Ms. Johnson should be offered a loan, for how much, and under what terms.

110.    Tekambi knows that interest rates like those charged by River Valley Loans are illegal under Florida law.

111.    Tekambi actively promotes its software at trade gatherings catering to customers, and potential customers, who make online loans at triple-digit interest rates, including the "Tribal Lending Summit" held in August 2022 in Lac du Flambeau, Wisconsin.

112.    Indeed, Tekambi was one of the premium sponsors of the Tribal Lending Summit.

113.    By actively promoting its software and services at venues exclusively devoted to online lending at 600%+ interest rates, Tekambi not only knows its products will be used for unlawful purposes, but actively encourages online loansharks to use its wares.

114.    Moreover, with respect to Ms. Johnson's loan, Tekambi knew: (a) she was a Florida resident, (b) the interest rate exceeded 600%, and, (c) the loan was funded by CreditServe, and not a tribal entity.

115.    With this knowledge, Tekambi provided services to the River Valley Loans racketeering conspiracy and was paid for such services.

### Clarity Knowingly Facilitates Loansharking

116.    Clarity is a nationwide CRA which primarily services the needs of online payday lenders like River Valley Loans – *e.g.*, lenders making short-term, small-dollar loans at triple-digit interest rates.

117.    Clarity maintains terabytes of proprietary data specifically tailored to assist online, subprime lenders in evaluating potential borrowers, including consumers' checking account histories, employment and salary data, and past payday loan experiences.

118.    Clarity then supplements this data with information from its parent company, Experian Information Solutions, Inc. ("**Experian**"), one of the "Big 3" nationwide CRAs, as well as with data from other specialty CRAs, including Chex Systems.

119.    Clarity merges its own data with that obtained from Experian and Chex Systems into one report, which it then sells to online lenders.

120.    Indeed, on June 29, 2022, the date Ms. Johnson applied for her First Loan from River Valley Loans, Clarity sold a consumer report regarding Ms. Johnson to River Valley Loans.

121.    Clarity's consumer report regarding Ms. Johnson was obtained by non-tribal service providers, including CreditServe, Tekambi, and at least one other entity, acting on behalf of River Valley Loans.

122.    Clarity has extensive policies in place to conduct due diligence on potential new customers, which includes, in most cases, sending an investigator to the primary business office of the lender.

123.    In situations where a lender is "tribally" owned but obtains consumer reports through a non-tribal service provider, Clarity typically sends its investigator to the offices of the service provider, *e.g.*, to the offices of CreditServe in California and/or Texas, not to the Crow Creek Sioux Tribe's reservation in South Dakota, where no lending office exists.

124.    Clarity also examines the states the lender does business in, and the lender's website, including pages which show the interest rates, terms, and fees assessed.

125.    Clarity is aware of CreditServe and Tekambi's involvement in the lending enterprise for River Valley Loans, even listing the "lender" of Ms. Johnson's loan as "Seaward-Creditserve-Tekambi-CinnamonBay-Next Level Servicing."

126.    Clarity has had numerous lawsuits filed against it concerning its provisioning of credit reports to online payday lenders with sham tribal affiliation, like River Valley Loans.

127.    Clarity has also produced several detailed reports for the online lending industry, such as its 2019 *Alternative Financial Services Lending Trends Insights into the Industry and its*

*Consumers*, which it stated analyzed 350 million loan applications and 25 million loans. Most of the loans were small-dollar, short-term loans made by online lenders.

128.    Clarity thus knew, when furnishing a consumer report regarding Ms. Johnson, that the data it was providing was in connection with the making of a loan at a triple-digit interest rate.

129.    Clarity's assistance in River Valley Loans' "rent-a-tribe" scheme is of critical importance, as is that of Tekambi and Viking.

130.    Absent the trove of data Clarity knowingly supplied for use by River Valley Loans, no such loan could have, or would have, been made to Ms. Johnson.

131.    Likewise, without access to the ACH system, or strong underwriting analytics, the Defendants' racketeering enterprise also would have disintegrated.

132.    Beyond this, Clarity accepts tradeline data from River Valley Loans, which data includes loan amounts, payments due, and payment history.

133.    Indeed, River Valley Loans, or its service provider, reported Ms. Johnson's Loans to Clarity.

134.    River Valley Loans reported to Clarity that Ms. Johnson's Second Loan was in the principal amount of $591, opened September 13, 2022, with a first due date of September 23, 2022.

135.    River Valley Loans also reported that the Second Loan had a balance of $983, last updated October 7, 2022, meaning Ms. Johnson's loan balance increased by 66% in a little more than three weeks.

136.    Clarity was thus on notice that Ms. Johnson's Loans from River Valley Loans charged interest at annual rates which vastly exceeded the maximum legal rate in most states, including Florida.

137.    Moreover, Clarity spends what is likely hundreds of thousands of dollars each year promoting itself and its services directly to online lenders like River Valley Loans.

138.    For example, Clarity was a "Gold Level" sponsor of the OLA 2022 Tribal Lending Conference; one of its employees, Paul Mitchell, a Senior Account Executive, was also a speaker at the conference and gave insights into what kind of consumers are likely to look for, and accept the terms of, "tribal" payday lenders.

139.    Clarity also periodically receives disputes from consumers about River Valley Loans tradeline data, alleging the loans are usurious and unenforceable.

140.    For years, courts have recognized the power of credit reporting to procure payment. A creditor's "ability to report on the credit habits of its customers is powerful tool designed, in part, to wrench compliance with payment terms." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

141.    At all times relevant, all of the Defendants sought to serve the Florida market, as did River Valley Loans.

142.    Therefore, the Defendants are subject to the jurisdiction of a Florida court. *See Avicolli v. BJ's Wholesale Club, Inc.*, 2021 WL 3471167, at *3 (E.D. Pa. Aug. 6, 2021) (holding a "defendant is properly subject to jurisdiction in a state where it seeks to serve that state's market.")

143.    Federal law, the Racketeer Influenced Corrupt Organizations Act ("RICO"), defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) 102.

144.    In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

145.    Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

146.    Here, CreditServe, Tekambi, Viking, Clarity, and Unknown Companies 1-10 are an association in fact enterprise that collaborated together for the common purpose of making, collecting, and profiting off illegal loans.

147.    Ms. Johnson has made payments of at least $642 to River Valley Loans for the null, void, and unenforceable loan made to her.

148.    Ms. Johnson has been damaged in that she has paid the Defendants for loans which are void and usurious pursuant to Florida law.

149.    Ms. Johnson has hired the aforementioned law firm to represent her in this matter and has assigned his right to fees and costs to such firm.

### COUNT I
### VIOLATIONS OF THE FCCPA – FLA. STAT. § 559.72(9)
### CreditServe and Viking only

150.    Ms. Johnson adopts and incorporates Paragraphs 1 – 149 as if fully restated herein.

151.    CreditServe and Viking violated **Florida Statutes § 559.72(9)** when they asserted the existence of a legal right which does not exist, specifically by attempting to enforce Ms.

Johnson's Loans, when they collected and attempted further collection of the Loans via ACH or debit card withdrawals, emails, and calls to Ms. Johnson.

152.    The actions of CreditServe and Viking were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Plaintiff and profiting from such collection.

153.    CreditServe and Viking each knew of the illegal nature of the Loans, as the Defendants have gone to great lengths to attempt to avoid Florida law through use of a "rent-a-tribe" scheme.

**WHEREFORE,** Ms. Johnson respectfully requests this Honorable Court enter judgment against CreditServe and Viking, jointly and severally for:

a.    Statutory damages of **$1,000.00**, pursuant to Fla. Stat.§ 559.77(2);

b.    Actual damages of at least **$642.72**, pursuant to Fla. Stat. § 559.77(2);

c.    Injunctive relief preventing the Defendants from attempting to collect alleged loan balances from Ms. Johnson made at unlawful rates, pursuant to Fla. Stat. § 559.77(2);

d.    Reasonable costs and attorney's fees pursuant to Fla. Stat. § 559.77(2); and,

e.    Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE CRCPA – FLA. STAT. § 772.103(3)

154.    Ms. Johnson adopts and incorporates Paragraphs 1 – 149 as if fully restated herein.

155.    The Defendants, through their joint operation of River Valley Loans, constitute an "enterprise" under CRCPA, Fla. Stat. § 772.102(3).

156.    The Loans charged interest rates far in excess of Florida's maximum permitted rate and, thus, the lines of credit constitute "unlawful debt" under Fla. Stat. § 772.102(2).

157.    The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

158.    The Defendants each participated in this conspiracy. CreditServe, Viking, Tekambi, and Unknown Companies 1-10 operated River Valley Loans, and Clarity provided the consumer data necessary for its operation.

159.    The Defendants' participation in the enterprise violated **Fla. Stat. § 772.103(3)** and caused Ms. Johnson to repay amounts on her unlawful Loans.

**WHEREFORE,** Ms. Johnson respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages of at least **$642.72** (for a total of at least **$1,928.16**), or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to Fla. Stat. § 772.104(1);

b.    Reasonable costs and attorneys' fees pursuant to Fla. Stat. § 772.104(1); and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT III
### VIOLATIONS OF THE CRCPA – FLA. STAT. § 772.103(4)

160.    Ms. Johnson adopts and incorporates Paragraphs 1 – 149 as if fully restated herein.

161.    The Defendants, through their joint operation of River Valley Loans, constitute an "enterprise" under CRCPA, Fla. Stat. § 772.102(3).

162.    As described in detail herein, the Defendants are a group of individuals and entities associated in fact, although they are not a single legal entity. Particularly, Defendants CreditServe, Viking, Tekambi, and Unknown Companies 1-10 operated essential functions of River Valley

Loans. Clarity is associated in fact by virtue of its ongoing business relationship with River Valley Loans, whereby it provides the underlying data necessary for River Valley Loans to evaluate potential borrowers for its high interest rate loans.

163.    The Loans charged interest rates far in excess of Florida's maximum permitted rate and, thus, the lines of credit constitute "unlawful debt" under Fla. Stat. § 772.102(2).

164.    The Defendants violated **Fla. Stat. § 772.103(4)** by conspiring with each other, and other persons and entities, to issue and collect unlawful debts through River Valley Loans.

165.    The Defendants were aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued the Loans to Ms. Johnson; (b) requested and obtained a consumer credit report regarding Ms. Johnson; (c) sold a consumer credit report regarding Ms. Johnson to assist with review of her loan application; (d) initiated ACH deposits and withdrawals to and from Ms. Johnson's bank account; (e) attempted collection of the Loans; (f) reported Ms. Johnson's Loans to Clarity; and, (g) incorporated tradeline data regarding the loan in reports sold regarding Ms. Johnson.

166.    The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful debts through River Valley Loans.

**WHEREFORE**, Ms. Johnson respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages of at least **$642.72** (for a total of at least **$1,928.16**), or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to Fla. Stat. § 772.104(1);

b.    Reasonable costs and attorneys' fees pursuant to Fla. Stat. § 772.104(1); and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT IV
## UNJUST ENRICHMENT
### CreditServe and Viking only

167.    Ms. Johnson adopts and incorporates Paragraphs 1 – 149 as if fully restated herein.

168.    The Loans issued by River Valley Loans to Ms. Johnson charged interest rates which rendered the Loans void and unenforceable in Florida.

169.    Ms. Johnson conferred a benefit on CreditServe and Viking when she made payments on the Loans, as she had no obligation to do so and, therefore, CreditServe, and by extension Viking, were owed nothing.

170.    CreditServe and Viking knew, or should have known, of the benefit; and CreditServe and Viking have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans such that it would be inequitable for CreditServe and Viking to retain the money they received.

**WHEREFORE,** Ms. Johnson respectfully requests that this Honorable Court enter judgment against CreditServe and Viking, jointly and severally, for:

a.      Actual damages for the payments conferred pursuant to the Loans; and,

b.      Any other relief this Court deems equitable and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Ms. Johnson hereby demands a jury trial on all issues so triable.

Respectfully submitted this November 28, 2022, by:

**SERAPH LEGAL, P. A.**

*/s/ Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar Number: 1015954
BMorgan@SeraphLegal.com

*/s/ Thomas M. Bonan*
Thomas M. Bonan, Esq.
Florida Bar Number: 118103
TBonan@SeraphLegal.com

1614 North 19th Street
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

| | |
|---|---|
| A | Plaintiff's Loan Agreement with River Valley Loans, June 29, 2022 - Excerpt |
| B | Loan Deposit to Plaintiff's Florida Bank Account, June 30, 2022 – Excerpt |
| C | Plaintiff's Payment History to River Valley Loans – Excerpt |
| D | Crow Creek Certificate of Licensure, Financial Services Company, September 7, 2021 |
| E | Overview of Tribal Employment Rights & Law Conference, April 2014 |
| F | Server Location for rivervalleyloans.com |
| G | Sponsors for 2022 Tribal Lending Conference |
| H | Eric Welch's Testimonial Regarding Viking |

# EXHIBIT F
## Server Location for rivervalleyloans.com



**EXHIBIT G**
**Sponsors for 2022 Tribal Lending Conference**



HOME     ABOUT

# Thank you to our Sponsors!
# Platinum Level:



# Gold Level:



# EXHIBIT H
## Eric Welch's Testimonial Regarding Viking



CreditServe

## Integration, Customer Service, and Convenience

The Viking Team works tirelessly ensuring clients are well-serviced and informed, which makes Viking the most reliable payment processor in the industry. On top of their extended hours and Sunday night ACH processing, they can integrate with any software. The extended hours are not just for processing, but they provide customer service later than other processors. Pure and simple, Viking is easy to use, reliable, and they truly put their clients first."

-ERIC WELCH, President & CEO, CreditServe

# EXHIBIT E
## Overview of Tribal Employment Rights & Law Conference, April 2014

# LAW SEMINARS INTERNATIONAL
*The power of information*®

**Featuring Speakers From:**

- Best & Flanagan LLP
- Faegre Baker Daniels LLP
- Hogen Adams PLLC
- Law Office of Richard G McGee
- Little River Casino Resort
- Littler Mendelson P.C.
- Lochen Law Offices, PLLC
- Modrall Sperling
- Navajo Nation Department of Justice
- Sonosky, Chambers, Sachse, Endreson & Perry, LLP
- The Jacobson Law Group
- The University of Tulsa College of Law
- William Mitchell College of Law

*A Comprehensive Two-Day Conference on*

# Tribal Employment
# Rights & Law

Critical legal issues in employment law in Indian country

## April 28 & 29, 2014
Prior Lake, Minnesota
Mystic Lake Casino Hotel

**Credits:** MN 10.5 CLE (call about others)
**Quick when/where:** 8:30 a.m., 2400 Mystic Lake Blvd.

---

**12:00    Best Practices for Setting Up Personnel and Dispute Resolution Systems**

Structuring the system: Essential elements for workable Tribal codes; selecting or creating effective grievance and dispute resolution bodies and processes; special considerations for partnering with non-Tribal entities for commercial enterprises

**Shane Thin Elk, Esq.**
Lochen Law Offices, PLLC ~ Onawa, IA

# EXHIBIT C
## Plaintiff's Payment History to River Valley Loans – Excerpt



Send Inquiries To:

**trax**
CREDIT UNION

3710 N 50th Street
Tampa, FL 33619
813.800.TRAX
**KESHA N JOHNSON**

TAMPA FL 33617



| SUFFIX | 015 CHECKING ACCT | | (CONTINUED) | |
|---|---|---|---|---|
| HISTORY DATE | (CONTINUED) DESCRIPTION | TRANSACTION AMOUNT | ACCOUNT BALANCE | |
| 7/15/22 | 8339874837 7/15/22 | 160.68- VBS RiverValleyL | 8339874837 | ▉ |
| 7/29/22 | 8339874837 7/29/22 | 160.68- VBS RiverValleyL | 8339874837 | ▉ |
| 8/12/22 | 8339874837 8/12/22 | 160.68- VBS RiverValleyL | 8339874837 | ▉ |

# EXHIBIT A
## Plaintiff's Loan Agreement with River Valley Loans, June 29, 2022 – Excerpt



| | |
|---|---|
| Loan # ■■■■■■ | |

| | |
|---|---|
| Agreement Date: 6/29/2022 | Loan #: ■■■■■■ |
| Effective Date: 6/30/2022 | Loan Type: Installment Loan |
| Wahido Lending d/b/a<br>River Valley Loans<br>P.O. Box  222<br>Ft. Thompson, SD 57339<br>Phone (833)987-4837 | Name: Kesha Johnson<br>City: Tampa<br>■■■■■■■■■■■■ |

**TRUTH IN LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 676.89 % | $2,613.94 | $600.00 | $3,213.94 |

**Your Payment Schedule will be:**

| Payment Number | Payment Amount | Payment Due Date |
|---|---|---|
| 1 | $160.68 | 7/15/2022 |
| 2 | $160.68 | 7/29/2022 |
| 3 | $160.68 | 8/12/2022 |
| 4 | $160.68 | 8/26/2022 |
| 5 | $160.68 | 9/9/2022 |
| 6 | $160.68 | 9/23/2022 |
| 7 | $160.68 | 10/7/2022 |
| 8 | $160.68 | 10/21/2022 |
| 9 | $160.68 | 11/4/2022 |
| 10 | $160.68 | 11/18/2022 |
| 11 | $160.68 | 12/2/2022 |
| 12 | $160.68 | 12/16/2022 |
| 13 | $160.68 | 12/30/2022 |
| 14 | $160.68 | 1/13/2023 |
| 15 | $160.68 | 1/27/2023 |
| 16 | $160.68 | 2/10/2023 |
| 17 | $160.68 | 2/24/2023 |
| 18 | $160.68 | 3/10/2023 |
| 19 | $160.68 | 3/24/2023 |
| 20 | $161.02 | 4/7/2023 |

# EXHIBIT B
## Loan Deposit to Plaintiff's Florida Bank Account, June 30, 2022 – Excerpt

Send Inquiries To:



3710 N 50th Street
Tampa, FL 33619
813.800.TRAX
**KESHA N JOHNSON**
███████████████
**TAMPA FL 33617**



| SUFFIX | 015 CHECKING ACCT | | (CONTINUED) |
|---|---|---|---|

| HISTORY DATE | (CONTINUED) DESCRIPTION | TRANSACTION AMOUNT | ACCOUNT BALANCE |
|---|---|---|---|
| 6/30/22 | 8339874837 | (600.00) | █████████ |
| | 6/30/22 | VBS RiverValleyL | 8339874837 |